FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Sep 10, 2025

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

BERTRAND W.,[1]

                    Plaintiff,

        v.

FRANK BISIGNANO,
Commissioner of Social Security,[2]

                    Defendant.

No.   2:25-cv-12-EFS

**ORDER REVERSING THE
ALJ'S DENIAL OF BENEFITS,
AND REMANDING FOR
MORE PROCEEDINGS**

Plaintiff Bertrand W. asks the Court to reverse the

Administrative Law Judge's (ALJ) denial of Title 16 benefits, arguing

---

[1] For privacy reasons, Plaintiff is referred to by first name and last

initial or as "Plaintiff." See LCivR 5.2(c).

[2] Pursuant to Federal Rule of Civil Procedure 25(d) and 42 U.S.C. §

405(g), Commissioner Frank Bisignano is substituted as Defendant.

DISPOSITIVE ORDER - 1

the ALJ failed to fairly and fully consider his mental impairments, including his depression, anxiety, and somatic symptom disorder, along with his physical impairments. As is discussed below, the ALJ erred at step two by failing to find depression to be a severe impairment; this error, along with an erroneous RFC, impacted the ALJ's non-disability finding. Therefore, this matter is remanded for further proceedings, including a physical consultative examination and a new hearing with testimony from a psychological medical expert.

## I.    Background

Plaintiff applied for supplemental security income under Title 16, claiming disability based on mental and physical impairments.[3] Plaintiff alleges a disability onset date of July 1, 2020.[4] After the agency denied benefits, ALJ Stewart Stallings held a telephone hearing in November 2023, during which Plaintiff and a vocational expert testified.[5]

---

[3] AR 199–210.

[4] AR 15, 42.

[5] AR 36–77, 112–26.

Plaintiff advised that he did not graduate from high school given his poor attendance resulting from his anxiety; yet, he did obtain his GED.[6] Plaintiff, who was 40 years old at the time of the hearing, testified that he lived with his mother.[7] Plaintiff is about 6'7"; however, his height varies due to his Scheuermann's disease, which impacts the curvature of his back.[8] Plaintiff testified that he previously worked at GameStop, where his friend was an assistant manager.[9] But he lost the job due to continued poor performance as he did not meet their required sales numbers, which he attributes to his anxiety and related anxiety attacks.[10] He last worked in 2012.[11] He has a difficult time dealing with people; he isolates himself in his room; and he has had a variety of physical health issues, including an increased heart rate,

---

[6] AR 44, 49–50.

[7] AR 44, 64.

[8] AR 44–45.

[9] AR 51.

[10] AR 51–52.

[11] AR 52.

exhaustion, and shortness of breath, which require him to lay down or recline to get his heart rate down.[12] Plaintiff testified that if he has an upcoming appointment he gets anxious in advance worrying about potential negative interactions with others.[13] Plaintiff shared that he struggles with pain and diarrhea, which he believes is set off by physical exertion and by his increased heart rate.[14] Plaintiff testified that due to his back conditions he has weakness and pain, difficulty breathing, and acid with reflux, particularly when his spine is curved more. If his back is straighter, he has difficulty with balance and twitches in his limbs, causing him to drop things. He also gets frequent back spasms, for which he takes muscle relaxers.[15] He is unable to stand or sit for too long or bend over; and he uses a grabber to pick up small items.[16] During the day, he transitions between sitting in front of

_____

[12] AR 52–54.

[13] AR 55.

[14] AR 56–58.

[15] AR 58.

[16] AR 59.

the computer or laying in bed watching TV, or playing games.[17] On the days he is feeling better, he will try and do some stuff around the house, but even then, he is limited in what he can physically do.[18] He is unable to do laundry, any chores that require bending, or outdoor chores.[19] He has not driven in years; his mother does the shopping.[20]

The ALJ issued a decision denying benefits.[21] The ALJ found Plaintiff's alleged symptoms were "not entirely consistent with the medical evidence and other evidence."[22] The ALJ found the lay

---

[17] AR 59.

[18] AR 59.

[19] AR 61–62.

[20] AR 60.

[21] AR 12–35. Per 20 C.F.R. § 416.920(a)–(g), a five-step evaluation determines whether a claimant is disabled.

[22] AR 23. As recommended by the Ninth Circuit in *Smartt v. Kijakazi*, the ALJ should replace the phrase "not entirely consistent" with "inconsistent." 53 F.4th 489, 499, n.2 (9th Cir. 2022).

statement from Plaintiff's mother to be unconvincing.[23] As to the medical opinions, the ALJ found:

- the State agency medical consultant findings from Leslie Postovoit, PhD; Norman Staley, MD; Susan Clifford, MD; and Alvin Smith, PhD, to be "generally persuasive."
- the opinions by the consultative psychological evaluators Douglas Uhl, PsyD, and Patrick Metoyer, PhD, to be unpersuasive.[24]

As to the sequential disability analysis, the ALJ found:

- Step one: Plaintiff had not engaged in substantial gainful activity since September 21, 2020, the application date.
- Step two: Plaintiff had the following medically determinable severe impairments: obesity, Scheuermann's disease, type II diabetes, anxiety, and autism spectrum disorder.

---

[23] AR 29.

[24] AR 26–29.

- Step three: Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.

- RFC: Plaintiff had the RFC to perform light work except:

  the claimant can stand/walk for 2 hours in an 8-hour workday and sit for 6-8 hours in an 8-hour workday. The claimant must never climb ladders, ropes, or scaffolds, but can rarely (defined as 15% of the time) stoop or climb ramps or stairs. The claimant must not crouch, kneel, or crawl, and must not be exposed to extreme cold, heat, wetness, humidity, vibration, moving dangerous machinery or unprotected heights. The claimant must be restricted to simple repetitive tasks with reasoning levels at 1 and 2. The claimant must be restricted to work that requires no more than occasional interaction with the public, coworkers, and supervisors, and must not work in a crowded area, such as a cafeteria or stadium.

- Step four: Plaintiff has no past relevant work.

- Step five: considering Plaintiff's RFC, age, education, and work history, Plaintiff could perform work that existed in significant numbers in the national economy, such as collator operator, routing clerk, and retail price marker.[25]

---

[25] AR 15–31.

Plaintiff timely requested review of the ALJ's decision by the Appeals Council and now this Court.[26]

## II.    Standard of Review

The ALJ's decision is reversed "only if it is not supported by substantial evidence or is based on legal error" and such error impacted the nondisability determination.[27] Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[28] The court looks to the entire record to determine if substantial evidence supports the ALJ's findings.[29]

---

[26] AR 1–6; ECF No. 1.

[27] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012). *See* 42 U.S.C. § 405(g); *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012), *superseded on other grounds by* 20 C.F.R. § 416.920(a).

[28] *Hill*, 698 F.3d at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)).

[29] *Kaufmann v. Kijakazi*, 32 F4th 843, 851 (9th Cir. 2022). *See also Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (requiring

DISPOSITIVE ORDER - 8

### III.   Analysis

Plaintiff argues the ALJ erred when evaluating the medical evidence and thereby erred at steps two and three and when crafting the RFC. In response, the Commissioner argues the ALJ reasonably evaluated the medical evidence and validly relied on the vocational expert's testimony at step five. As is explained below, the ALJ consequential erred at step two and when crafting the RFC.

### A.    Step Two: Plaintiff establishes consequential error.

Plaintiff argues the ALJ erred at step two by failing to find depression to be a severe impairment. The Commissioner argues that, notwithstanding the diagnosis of depression by the consultative examiners, the ALJ's decision to discount these examiners' opined limitations was supported by substantial evidence and therefore the ALJ reasonably found Plaintiff's depression to be non-severe. As is

_____

the court to consider the entire record, not simply the evidence cited by the ALJ or the parties) (cleaned up); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered[.]").

explained below, Plaintiff prevails on his argument that the ALJ consequentially erred at step two.

1.  Standard

At step two, the ALJ determines whether the claimant suffers from a severe impairment, i.e., one that significantly limits his physical or mental ability to do basic work activities.[30] This involves a two-step process: 1) determining whether the claimant has a medically determinable impairment, and 2) if so, determining whether the impairment is severe.[31] To be severe, the medical evidence must establish that the impairment would have more than a minimal effect on the claimant's ability to work.[32]

Neither a claimant's statement of symptoms, nor a diagnosis, nor a medical opinion sufficiently establishes the existence of an

---

[30] 20 C.F.R. § 416.920(c).

[31] *Id.* § 416.920(a)(4)(ii).

[32] *Id.*; *see also* Soc. Sec. Rlg. (SSR) 85-28 (Titles II and XVI: Medical Impairments That Are Not Severe).

impairment.[33] Rather, "a physical or mental impairment must be established by objective medical evidence from an acceptable medical source."[34] If the objective medical signs demonstrate the claimant has a medically determinable impairment,[35] the ALJ must then determine whether that impairment is severe.[36]

The severity determination is discussed in terms of what is *not* severe.[37] A medically determinable impairment is not severe if the "medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work."[38] Because step two is

---

[33] 20 C.F.R. § 416.921.

[34] *Id. See also* SSR 85-28 at *4.

[35] "Signs means one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from [a claimant's] statements (symptoms)." 20 C.F.R. § 416.902(l).

[36] *See* SSR 85-28 at *3.

[37] *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996).

[38] *Id.*; *see* SSR 85-28 at *3.

simply to screen out weak claims,[39] "[g]reat care should be exercised in applying the not severe impairment concept."[40] Step two "is not meant to identify the impairments that should be taken into account when determining the RFC" as step two is meant *only* to screen out weak claims, whereas the crafted RFC must take into account all impairments, both severe and non-severe.[41]

### 2.    The ALJ's findings

The ALJ found Plaintiff had the severe impairments of obesity, Scheuermann's disease, type 2 diabetes, anxiety, and autism spectrum disorder.[42] In contrast, the ALJ found Plaintiff's depression, hernia (repaired), Barrett's esophagus, sinus tachycardia, and postural orthostatic tachycardia syndrome to be non-severe impairments, and

---

[39] *Smolen*, 80 F.3d at 1290.

[40] SSR 85-28 at *4.

[41] *Buck v. Berryhill*, 869 F.3d 1040, 1048–49 (9th Cir. 2017).

[42] AR 17.

somatic symptom disorder to be a non-medically determinable impairment.[43]

As to depression, the ALJ highlighted that there were only a handful of times that Plaintiff was diagnosed with depression, and that besides these few times and his description of depressive symptoms to Dr. Uhl, Plaintiff did not seek treatment for depression.[44] Moreover, the ALJ found Dr. Uhl's psychological consultative opinion, which included moderate to marked limitations, unpersuasive.[45]

3.    <u>Depression: examinations and the ALJ's analysis of such examinations</u>

Two psychological evaluations were held, one by Dr. Uhl in July 2020, and a second by Dr. Metoyer in February 2022.[46] During the mental status examination with Dr. Uhl, which was conducted by telephone, Plaintiff presented with firm, assertive speech; a resigned

---

[43] AR 17–19.

[44] AR 18.

[45] AR 28.

[46] AR 307–10, 653–57.

attitude and behavior due to his "deteriorating disability," and a despondent mood and flat affect.[47] Dr. Uhl found there was no evidence of a thought disorder even though Plaintiff was depressed, anxious, and did not know the date, and his memory, perception, fund of knowledge, and abstract thought were within normal limits, although he was not insightful but his judgment was improving. Dr. Uhl noted, as to the clinical interview, that Plaintiff's daily activities involved mostly taking care of his personal hygiene, watching the news, or being online, and that Plaintiff reported that he has extreme fatigue and difficulties breathing when he is upright too long. Dr. Uhl found that Plaintiff had symptoms of anxiety, pain, depression, and panic, and he diagnosed him with autism spectrum disorder, depressive disorder due to numerous medical conditions, anxiety disorder due to numerous medical conditions, panic disorder, and somatic symptom disorder with predominate pain. Dr. Uhl opined marked limitations in the following basic work activities: perform routine tasks without special supervision; adapt to changes in a routine work setting; make simple

---

[47] AR 310.

work-related decisions; maintain appropriate behavior in a work setting; set realistic goals and plan independently; complete a normal workday and workweek without interruptions from psychologically based symptoms; and perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances without special supervision. Dr. Uhl also opined that Plaintiff was moderately limited in his abilities to be aware of normal hazards and take appropriate precautions, ask simple questions or request assistance, and communicate and perform effectively in a work setting.

About a year and a half later, Dr. Metoyer conducted an in-person consultative mental examination.[48] Dr. Metoyer reviewed Dr. Uhl's report, a March 17, 2016 physical evaluation record, and an April 22, 2013 psychological evaluation record.[49] Plaintiff shared with Dr. Metoyer that he experienced depressive symptoms, which

_____

[48] AR 653–57.

[49] AR 653. Dr. Uhl's report is part of the administrative record but the other two documents reviewed by Dr. Metoyer are not part of the record.

Dr. Metoyer noted as including a "depressed mood, anhedonia, difficulty concentrating, difficulty sleeping, fatigue, [and] feelings of helplessness/worthlessness."[50] Dr. Metoyer observed Plaintiff with adequate hygiene, cooperative, engaged, and with an "average, okay" mood with congruent affect, normal speech, orientation, adequate memory, and no difficulty following the conversation.[51] Plaintiff told Dr. Metoyer that he leaves his house about once a month for appointments, he showers once a week as he has some difficulty with personal care and hygiene, he self-isolates, he interacts with people online once or twice a week, and he is able to watch TV. Dr. Metoyer found Plaintiff's "mental health prognosis is guarded as he describes that while he would like to work, he has difficult time with anxiety, mood symptoms, autism spectrum disorder symptoms, and being around other people."[52] He opined that:

> [Plaintiff's] ability to interact with coworkers and the public is likely mildly to moderately impaired. Due to autism

---

[50] AR 654.

[51] AR 656.

[52] AR 657.

spectrum disorder, anxiety, mood symptoms, and tendency to isolate himself from others, his ability to maintain regular attendance in the workplace is markedly impaired. The claimant's ability to understand, remember and carry out complex instructions is moderately to markedly impaired. His ability to complete a normal workday or work week without interruption from anxiety, mood symptoms, autism spectrum disorder symptoms is likely markedly impaired. His ability to deal with the usual stress encountered in the workplace is markedly impaired if it involves persistent activity, interacting with other individuals. He appears to have some potential physical limitations that would better be assessed by a medical provider.[53]

In addition to the observations during these psychological examinations, Plaintiff's treating notes reflect a history of depression.[54]

The ALJ erred by failing to recognize that Dr. Metoyer—in addition to Dr. Uhl—diagnosed depression, i.e., "major depressive disorder, recurrent, moderate."[55] Both of these evaluators found Plaintiff's depression to impact him more than minimally. Moreover, the reviewing psychologists—Dr. Postovoit and Dr. Smith—also found

_____

[53] AR 657.

[54] AR 416, 421, 424, 429, 799, 800, 848, 908.

[55] AR 656.

Plaintiff's "depressive, bipolar and related disorders" to be severe.[56] Therefore, the ALJ clearly erred by failing to find depression to be a severe impairment.

This error was consequential. Even Dr. Postovoit and Dr. Smith, who found Plaintiff's depression to be less limiting than as opined by Dr. Uhl and Dr. Metoyer, opined that Plaintiff's should only interact with others on an "occasional/superficial basis" (Dr. Postovoit) or "superficial level" (Dr. Smith).[57] Yet, in contrast, the ALJ's crafted RFC allowed Plaintiff to have "occasional interaction with the public, coworkers, and supervisors . . . in a non-crowded area, such as a cafeteria or stadium."[58] The ALJ did not explain why he did not include the opined superficial-interaction restriction, but instead restricted Plaintiff to occasional interactions in non-crowded areas.

The terms "superficial" and "occasional" were not defined by Dr. Postovoit; nor was "superficial" defined by Dr. Smith. The Social

---

[56] AR 81, 96.

[57] AR 84–85, 103–04.

[58] AR 22.

Security Administration (SSA) does not define superficial but does define "occasionally" in the context of exertional limitations, as "occurring from very little up to one-third of the time."[59]  Because the SSA does not define superficial, the Court turns to the dictionary definition, which is "insignificant or unimportant."[60]

Thus, there is a distinction between occasional and superficial. Occasional, as defined by the SSA, pertains to timing; and superficial, per its dictionary definition, relates to the nature or type. Applying those definitions here, an occasional social interaction is one that occurs from very little up to one-third of the time; whereas a superficial social interaction is one that is insignificant or unimportant to the work tasks.

The omission of a limitation to superficial interactions in the RFC highlights the consequential impact of the ALJ's step-two error of not finding depression to be a severe impairment.

_____

[59] SSR 96-6p at *3, *8.

[60] Black's Law Dictionary, available at

https://thelawdictionary.org/superficial/ (last viewed Sept. 3, 2025).

## B.    Other Steps: The ALJ must reevaluate on remand.

Plaintiff also argues that 1) substantial evidence supports a listing-level mental-health impairment, 2) the ALJ failed to fully consider Plaintiff's symptoms when crafting the RFC; and 3) remand for benefits is appropriate.[61] Because the ALJ consequentially erred at step-two by failing to consider Plaintiff's depression as a severe impairment, the ALJ's other disability-step arguments are moot. Further development of the record is necessary for a proper disability determination.[62]

First, a physical consultative examination is needed. Plaintiff reports the need to use a cane or wheelchair if he is too fatigued or in pain when seeking medical care, and Dr. Metoyer noted that Plaintiff

---

[61] Plaintiff erroneously refers to step four when making his RFC argument. ECF No. 29–30. The ALJ found that Plaintiff had no past relevant work at step four and therefore the ALJ made the RFC-vocational assessment at step five, not step four.

[62] *See Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2018); *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014).

reported using a cane as an assistive device.[63] However, during examinations, Plaintiff is often noted as having a stable gait.[64] Because this matter is being remanded due to the step-two error, a consultative physical examination to assess Plaintiff's physical abilities is to be ordered.[65] It would be helpful if this physical examination included a treadmill exercise test, but only if the medical consultant determines that such procedure will not involve significant risk to Plaintiff.[66]

Furthermore, at the next hearing, the ALJ is obtain testimony from medical source(s) qualified to opine as to the impact of Plaintiff's mental impairments, along with any fatigue and/or pain resulting from his physical impairments, on his ability to work.

After developing the record, the ALJ is to reconsider the medical evidence and the symptom reports, and reevaluate the sequential

---

[63] AR 238, 264, 494, 653, 760, 805, 859.

[64] AR 370, 397, 425.

[65] The record must clearly identify what medical records the examiner reviewed.

[66] *See* POMS HA 01250.020 (Consultative Examinations).

process. Moreover, if the opined superficial-interaction limitation is found persuasive, it must be incorporated into the RFC. [67]

### IV.  Conclusion

Plaintiff establishes the ALJ erred. The ALJ is to develop the record and reevaluate—with meaningful articulation and evidentiary support—the sequential process.

Accordingly, **IT IS HEREBY ORDERED**:

1.  The ALJ's nondisability decision is **REVERSED, and this matter is REMANDED to the Commissioner of Social Security for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g)**.

---

[67] *Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1006  (9th Cir. 2015) ("[T]he ALJ is responsible for translating and incorporating clinical findings into a succinct RFC."); *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 884 (9th Cir. 2006) ("If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."); SSR 96-8p: Assessing Residual Functional Capacity in Initial Claims.

1      2.      The Clerk's Office shall **TERM** the parties' briefs, **ECF**

2      **Nos. 8 and 13**, enter **JUDGMENT** in favor of **Plaintiff**,

3      and **CLOSE** the case.

4      IT IS SO ORDERED. The Clerk's Office is directed to file this

5 order and provide copies to all counsel.

6      DATED this 10th day of September 2025.

7

8      _____
       EDWARD F. SHEA
       Senior United States District Judge

9

10

11

12

13

14

15

16

17

18

19